IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION

| | |
|---|---|
| **NAOMI WISHART,** | Civ. No. 6:20-cv-01440-AA |
| Plaintiff, | **OPINION AND ORDER** |
| v. | |
| **LANE COUNTY SHERIFF'S OFFICE,** | |
| Defendant. | |

AIKEN, District Judge:

Plaintiff Naomi Wishart brings this civil rights action against her former employer, Defendant Lane County Sheriff's Office, under Title VII of the Civil Rights Act, 42 U.S.C. §§ 2000e-2 and 2000e-3 and ORS 659A.030. Before the Court is Defendant's Motion for Summary Judgment ("Def.'s MSJ") and Plaintiff's Partial Motion for Summary Judgment ("Plf.'s MSJ"). Defendant's Motion for Summary Judgment, ECF No. 28, and Plaintiff's Motion for Partial Summary Judgment, ECF No. 31, are DENIED.

### FACTUAL BACKGROUND

Lane County operates and administers the Lane County Jail ("jail") through Defendant Lane County Sheriff's Office. The jail is an adult detention center for

minimum, medium, and maximum-security adults in custody ("AIC/s"). The jail houses both male and female AICs and has the capacity to house 411 AICs. Riley Decl. at 2 ¶ 9, Ex. A, ECF 28-1. In 2019, when most of the events in this case took place, the jail housed around 360 AICs, 60 to 80 of whom were women. Plf.'s MSJ at 4. At the time of filing, there are 81 male deputies and 19 female deputies assigned to the jail. Riley Decl. at 2 ¶ 9. Plaintiff is a former female deputy at the jail.

There are three shifts at the jail: graveyard, day, and swing shift. Deputies' duties include processing and transporting AICs in and out of the jail; to medical appointments; to areas within the jail for visitation, exercise, meal services; for audio and visual "personal inspection" once per hour under ORS 169.076(1); and for counting. *Id.* at 2 ¶ 10.

## I. Defendant's "Bona Fide Occupational Qualification" Overtime Policy

Defendant maintains that, to protect female AICs from male deputy sexual misconduct and to protect male deputies from allegations of sexual misconduct, Defendant identified "specific posts within the [j]ail that warrant the application of the bona fide occupational qualification ("BFOQ") based on sex." Def.'s MSJ at 2.

Defendant states that minimum female staffing levels require at least two BFOQ designated staff—women deputies—for day and swing shifts, and one BFOQ designated staff for the graveyard shift. These minimum female staffing levels, Defendant asserts, are necessary to protect female AICs from unconstitutional searches by guards of the opposite sex, *i.e.*, pat-downs, frisks, and observation of female AICs using showers or toilets. *Id.* at 3-4.

Case 6:20-cv-01440-AA    Document 48    Filed 06/28/23    Page 3 of 18

To meet jail staffing needs, all deputies, both male and female, are subject to standard mandatory overtime. Female deputies are also subject to mandatory, involuntary overtime based on their gender to meet what Defendant determines are its minimum staffing requirements. Wells Dep., Ex. 10 at 14:11-25, ECF No. 33-10 ("mandatory overtime is mandatory overtime . . . and there's female-only overtime."). Plaintiff describes the BFOQ mandatory overtime as "distinct from and in addition to the standard mandatory overtime that all deputies, both male and female, are required to fulfill." Plf.'s MSJ at 6.

In operation, deputies of all genders are listed on a single mandatory overtime roster and assignments for mandatory overtime shifts are chosen from the top of the roster. Rosander Dep. Ex. 2 at 46:12-20, ECF No. 33-2. Male deputies are listed in black text and female deputes in red. *Id*. at 44:21-45:12. Once a deputy has been selected from the mandatory overtime roster, their name is moved to the bottom of the roster. *Id*. However, when Defendant determines that it needs a female deputy for BFOQ overtime, it selects from only the females on the mandatory overtime roster, typically from among the female deputies already scheduled to work their regular shift before or after the mandatory overtime shift to be filled.

In depositions, an illustrative example illuminated that, hypothetically, Plaintiff could be listed ten names down the roster for standard mandatory overtime, but if the jail needed a female deputy to work overtime, Plaintiff could be selected if she was the female deputy working the shift before or after, or if she was the first female in line on the roster. Wilkerson Dep., Ex. 1 at 28:16-25, ECF No. 33-1; Rosander Dep. at 48:17-49:3.

Page 3 – OPINION AND ORDER

Defendant has on many occasions revisited and revised its BFOQ policy over the years, taking into consideration updates in case law, input from female deputies, and by establishing committees to research and make recommendations about the BFOQ policy. *See* Def.'s MSJ at 6-12 (describing in detail its BFOQ policy reform work). In depositions, female deputies characterize the nature of the BFOQ overtime policy as unpredictable, requiring them to work mandatory overtime shifts sooner in time than if they were subject only to standard overtime, explaining that it causes conflict among them when to cover the BFOQ shifts. *See* Plf.'s MSJ at 7-8 (cataloguing deposition testimony from female deputies describing the negative effect of the gender-based overtime policy, in addition to standard overtime).

## II. Plaintiff's Termination

Defendant employed Plaintiff as a Deputy Sheriff from July 28, 2014, until she was terminated on August 28, 2019. During her employment, Plaintiff was never subject to discipline and had no sustained allegations of misconduct. Def.'s MSJ at 12. Plaintiff believed that the BFOQ mandatory overtime policy was inconsistent and constituted unlawful discrimination. Wishart Dep., Ex. 3 at 22:8-13, 46:22-47:12, ECF No. 33-3. She spoke to her union, but the union did not "see any validity" to submitting a grievance because the union determined the BFOQ policy was lawful. *Id*. at 53:10-24; Def.'s MSJ at 40. Plaintiff also held conversations with her superiors expressing her concerns about the lawfulness of the BFOQ mandatory overtime policy. *See* Wells Dep. at 55:1-56:14 (Sargent Wells stating that Plaintiff had "many conversations" with supervisors about the policy.). Plaintiff also outlined her concerns in an email sent to two of her superiors. ECF No. 33-5.

Plaintiff was subject to standard mandatory overtime and BFOQ overtime for designated female positions within the jail. In day-to-day operation, female deputies are expected to trade shifts and assist one another, if possible, to satisfy BFOQ mandatory overtime staffing needs. During Plaintiff's 2019 divorce proceedings, Defendant granted her two exceptions to her BFOQ mandatory overtime shift to accommodate Plaintiff's court ordered appearances. Wishart Dep. at 77:20-78:16. As a result of those exceptions, Plaintiff maintains that other female deputies grew reluctant to fill in for any further of Plaintiff's shifts. *Id*. at 94:9-96:12; 97:11-13. Female deputy dissatisfaction led to an all-female-deputy meeting to address concerns about the policy. Wells Dep. at 17:6-11.

In the Spring of 2019, Plaintiff missed a court-ordered visitation between her former husband and children due to her assignment on a mandatory BFOQ overtime shift. Ex. P at 6, ECF No. 28-16. On June 27th, Plaintiff took a standard overtime shift on June 27, 2019, which led to removal of her name from the top of the roster and placed at the bottom. Wishart Dep. at 120:13:21. Two days later, on June 29, 2019, Plaintiff was listed on the standard mandatory overtime roster in the twentieth position—that is, twenty names down from the top of the list to be chosen for a mandatory overtime shift. ECF No. 33-9. She had purchased concert tickets for that evening, and based on her twentieth position on the roster, was not expecting to be ordered to a mandatory overtime shift. Wishart Dep. at 119:19-120:21. However, Plaintiff's superior announced the need for a BFOQ mandatory overtime shift that evening, and Plaintiff was listed as the next female on the list. All efforts to obtain

another female deputy to volunteer to cover the full shift in Plaintiff's stead failed. Rosander Dep. at 39:9-40:19.

Plaintiff's superior ordered Plaintiff to work the BFOQ overtime shift, but Plaintiff refused and abandoned her post when her regular shift ended. Ex. S at 5, ECF No. 28-19. Defendant alleges that, as a result of refusing the order, Defendant terminated Plaintiff from her position on August 28, 2019. Defendant maintains that there is no evidence of other employees, who disobeyed an order by abandoning their post, who were subjected to a lesser discipline. Ex. Y at 1, ECF No. 28-25.

Plaintiff moves for partial summary judgment contending that Defendant's overtime policy exposes female employees to a greater occurrence of involuntary, unanticipated, mandatory overtime compared to male employees. Plf.'s MSJ at 6. In Plaintiff's view, the policy violates the prohibition under § 2000e-2 of Title VII against disparate treatment and is not necessary for, or reasonably tied to, the operational needs of the jail. *Id*. at 9-14. Defendant moves for summary judgment on Plaintiff's disparate impact claim, contending that the BFOQ mandatory overtime policy is lawful and necessary for its operations. Def.'s MSJ at 18. Defendant also asserts that Plaintiff's termination was based solely on her disobedience of a lawful order, and as such, was not unlawful retaliation. *Id*. at 38. Plaintiff responds that her termination was unlawful retaliation violating Title VII, § 2000e-3. Plf.'s Resp. at 15, ECF No. 40.

## STATUTORY BACKGROUND

### I. Disparate Treatment

Under Title VII, 42 U.S.C. § 2000e-2(a), it is an unlawful employment practice for an employer to discriminate against any individual with respect to compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex or national origin; or to limit, segregate, or classify employees in any way which would deprive an individual of employment opportunities or otherwise adversely affect the status of an employee because of the individual's race, color, religion, sex, or national origin.

Notwithstanding this provision, it is *not* an unlawful employment practice for an employer to hire and employ employees, on the basis of religion, sex, or national origin in certain instances where religion, sex, or national origin "is a bona fide occupational qualification reasonably necessary to the normal operation of that particular business or enterprise." 42 U.S.C. § 2000e-2(e)(1).

## II.  Retaliation

Under 42 U.S.C. § 2000e-3, it is unlawful employment practice for an employer to discriminate against an employer because that employee has "opposed any practice made an unlawful employment practice."

## III.  State Law Claims

Plaintiff also brings her claims under ORS 659A.030 for disparate treatment and retaliation—two statutes which are modeled after Title VII and under which the Court's analysis is substantially similar

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when there exists no genuine issue as to

any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Matsushita Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The purpose of summary judgment is to "pierce the pleadings and assess the proof in order to see whether there is a genuine need for trial." *Matsushita*, 475 U.S. at 586, n. 11. The moving party bears the initial burden demonstrating the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

When a motion for summary judgment is made and properly supported, a party opposing the motion "may not rely merely on allegations or denials in its own pleadings." Fed. R. Civ. P. 56(e). Instead, the nonmoving party must present "specific facts showing that there is a genuine issue for trial." *T.W. Electrical Service, Inc. v. Pacific Electrical Contractors Asso.*, 809 F.2d 626, 630 (9th Cir. 1987). "A material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The inquiry is "whether there is the need for a trial – whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson*, 477 U.S. at 250. Conversely, "where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party," there is no genuine issue for trial. *Hanon v. Dataproducts Corp.,* 976 F.2d 497, 500 (9th Cir. 1992) (internal citations omitted).

## DISCUSSION

Plaintiff does not dispute that there are some duties at the jail—physical pat-downs, frisks, and observation of female AICs in the nude—which necessitate the BFOQ exception, requiring a female-only deputy to administer. Plf.'s MSJ at 3. Plaintiff takes issue with Defendant's overtime policy that subjects female deputies to both standard overtime and BFOQ overtime, asserting that such a policy is unnecessary to the operation of the jail. *Id*. at 17; Plf.'s Resp. at 14, ECF No. 40

Defendant asserts that the BFOQ exception to Title VII's general prohibition of discrimination on the basis of sex has long been held to be "reasonably related" to the essence of corrections' business, which is to maintain the security of the facility. Def.'s MSJ at 19. Defendant maintains that protecting female inmates from sexual misconduct by male deputies, maintaining jail security, protecting inmate privacy, and preserving the ability of female inmates to rehabilitate are all essential to the operation of a corrections facility and have been recognized as justifying facially discriminatory policies in other contexts. *Id*. at 20. Defendant contends that its decisions about how to best administer its resources are entitled to a degree of deference. *Id*. Finally, that any imposition the gender-based overtime policy places on Plaintiff is but a *de minimus* restriction, where Defendant's penological interests outweigh Plaintiff's desire not to be subject to the policy. *Id*. at 21-22.

### I. Reasonable Necessity of BFOQ Overtime Policy

The Supreme Court has emphasized that "[t]he BFOQ defense is written narrowly, and this Court has read it narrowly." *UAW v. Johnson Controls, Inc.*, 499

U.S. 187, 201 (1991). To justify discrimination under the BFOQ exception, an employer must show, by a preponderance of the evidence, that: (1) the "job qualification justifying the discrimination is reasonably necessary to the essence of its business"; and (2) that "sex is a legitimate proxy for determining" whether a correctional officer has the necessary job qualifications." *Ambat v. City & Cty. of San Francisco*, 757 F.3d 1017, 1025 (9th Cir. 2014).

Although limited gender discrimination may be permissible in the prison employment context, prison administrators do not get a free pass. Prison officials must have an objective "basis in fact" for "its belief that gender discrimination is 'reasonably necessary'—not merely reasonable or convenient—to the normal operation of its business." *Teamsters Loc. Union No. 117 v. Washington Dep't of Corr.*, 789 F.3d 979, 987 (9th Cir. 2015) (citing *W. Air Lines, Inc. v. Criswell*, 472 U.S. 400, 414 (1985)).

Here, Plaintiff and Defendant do not appear to disagree that "sex is a legitimate proxy" to determine whether a correctional officer has the necessary job qualifications—here, the qualification to perform physical searches of female AICs. Rather, the parties dispute whether the overtime policy is "reasonably necessary" to normal operations. *Ambat,* 757 F.3d at 1025. Each party presents compelling factual evidence concerning the necessity of the overtime policy.

The record includes evidence that female AICs are *not* routinely subject to pat-down searches—even when female deputies are on duty and present. Exs. 1 and 2, ECF No. 33-1, 33-2. Additional evidence is that Defendant's protocols on physically searching female AICs are permissive rather than mandatory, and that pat-downs

Page 10 – OPINION AND ORDER

are only required when a female deputy is present to conduct that search. Wells Dep. at 08:17-25. Further, while it is preferred that a female deputy administer strip searches and accompany female AICs in transport, the jail permits male deputies to do so when no female deputies are available. *See* Plf.'s MSJ at 10-11 (cataloguing deposition testimony of that policy).

The record shows that Defendant does not apply gender restrictions to all positions of female AIC supervision, and it has developed a number of "alternate policies and procedures to protect female AIC privacy, prevent sexual misconduct by male staff, prevent allegations of sexual misconduct by female AICs and maintain jail security." Def.'s MSJ at 29.

Defendant's host of alternate measures in place include permission that hourly visual checks (not physical pat-downs or visual inspections in the nude) for general health and welfare may be conducted by both male and female deputies for opposite-sex AICs. Ex. A at 7, ECF No. 28-1. Male and female deputies must make reasonable accommodations to reduce the scope of intrusion to opposite-sex AICs, including but not limited to announcing their presence in a housing unit for AICs of the opposite sex. *Id*. All showers in housing units are equipped with privacy doors. *Id*. All AICs are required to dress and undress in the privacy of the shower stall. Ex. W, ECF No. 28-23. All toilets located in general housing units or dayroom areas are equipped with doors or have architectural barriers to provide privacy for AICs. Ex. A at 7, ECF No. 28-1. All AICs are required to be fully clothed when not in their bunks. *Id*. After lights out, male AICs housed in dormitory pods are required to wear their pants and t-shirt to access the toilets and female AICs are required to wear a nightgown or pants

and t-shirt. *Id*. Female AIC pods have a single shower stall built into the side of a concrete wall. *Id*. The shower stall is surrounded on three sides by solid concrete walls, a concrete ceiling, and an opaque door that when closed creates a physical barrier to an AIC being viewed from the shoulders to the knees. *Id*. The single shower stall in the female AIC housing units has an alcove that extends beyond the immediate shower area and door that provides an approximate additional three feet of interior space. *Id*. This area is also enclosed by three solid cement walls and ceiling and allows the AIC to step away from the opaque shower door to an area with additional privacy during a welfare check, or for purposes of dressing and undressing. *Id*.

Plaintiff asserts that, even after visitation—a "high risk" contraband scenario necessitating pat-down searches of female AICs—such pat-downs are seldom conducted. Plf.'s MSJ at 9. Defendant presents evidence that only pre-approved individuals with specific business needs, such as attorneys and law enforcement are allowed in-person contact and that all other visitors remain physically separated from AICs, and that as such, visitation is actually a "low-risk" interaction for the potential for contraband and, apparently, does not routinely necessitate the need for physical search. Rice Decl., Ex. C at 2, ECF No. 38-3.

On the other hand, Defendant maintains that the BFOQ minimum staffing policy—and as it follows—its BFOQ overtime policy—is not in place to guarantee that female AICs are routinely pat down—it is in place to ensure that *when* a physical pat down is required, a female deputy is available to conduct it. Def.'s Resp. at 11, ECF No. 38. Defendant's primary evidence related to the necessity of the policy is that

Page 12 – OPINION AND ORDER

Defendant developed its BFOQ overtime policy over many years, and that the policy has been revised, reviewed, and updated time and again based what the jail determines are its "minimum staffing needs" to comply with constitutional requirements announced in case law. *See* Def.'s MSJ at 4-12 (cataloguing cases culminating in principle that the constitution protects prisoners from opposite-sex, nonemergency, suspicionless searches involving contact with or viewing of prisoner's intimate parts); *see also* Harrold Decl. at 3, ECF No. 28-2 (jail prohibits pat-downs of female AICs by male deputies absent exigent circumstances).

Defendant's legal argument is that its BFOQ overtime policy is the result of reasoned decision-making and it argues that the policy reflects constitutional standards understood to be reasonably necessary to the normal operation of the jail's essential functions. Def's MSJ at 19. And Defendant asserts that prison administrators are entitled to a degree of deference, even in the Title VII context, because the ability of administrators "to plan and muster resources" is the primary nature of the executive—as opposed to the judicial—branch of government to run prisons . . ." *Id.* at 20-21 (citing *Everson v. Michigan Dept. of Corrections*, 391 F.3d 737, 750 (2004)).

The Court acknowledges that Defendant has engaged in great effort to develop its policies according to constitutional requirements and that it is owed "some deference." *Robino v. Iranon,* 145 F.3d 1109, 1110 (9th Cir. 1998). However, because both parties present compelling evidence on a disputed fact material to the resolution of the legal issue in this case—whether the BFOQ overtime policy is necessary for the

Page 13 – OPINION AND ORDER

jail's essential operations—both parties' motions for summary judgment must be denied on that issue. Fed. R. Civ. P. 56(c).

II.     Whether Harm is "*De Minimus*" in Nature

Defendant contends that Plaintiff cannot demonstrate disparate impact and that any harm imposed by the gender-based overtime policy is but a *de minimus* restriction, where Defendant's penological interests outweigh Plaintiff's desire not to be subject to the policy. *Id*. at 21-22.

Defendant supplies evidence that female deputies are not subjected to significantly greater overtime than their male counterparts and that Plaintiff's overtime hours for the year relevant to this lawsuit place her near the bottom of the list in terms of overtime worked for either male or female deputies. Def.'s MSJ at 34; Ex. BB, ECF No. 28-34. Defendant does not have evidence differentiating between overtime hours that were imposed involuntarily, as opposed to overtime hours for which deputies volunteered.

Plaintiff submits that, far from a "*de minimis*" burden, the policy caused her to miss numerous family events and violate a court order, it alienated her from her peers, and it ultimately forced her from law enforcement. As noted above, Plaintiff supplied deposition testimony from other female deputies averring to the involuntary, unpredictable nature of the BFOQ overtime policy and how that had a negative effect on their personal lives and ability to maintain a desired schedule. Plaintiff also submits evidence that she was terminated for failing to comply with the BFOQ overtime policy, an alleged injury that negates Defendant's assertion that Plaintiff can only show but "*de minimus*" harm.

Page 14 – OPINION AND ORDER

Defendant cites to *Robino*, 145 F.3d at 1109-1111 for support. In *Robino*, the plaintiffs were male guards complaining that female guards—guards holding the same position—were to a limited degree, given different job assignments within the same job category. It was in this context that *Robino* held that the post-restriction policy "limits eligibility for such a small number of positions (six out of forty-one) that it imposes such a *de minim[i]s* restriction on the male [guards'] employment opportunities" *Id*. at 1110.

Here, Plaintiff complains not that she is given different job assignments within the same category as the male deputies, or even that, under the same overtime system, she is saddled with more overtime than men. Rather, Plaintiff's alleged harm is that she and other female deputies are subjected to a systematically different scheduling protocol than the male deputies, whereby male deputies can reasonably rely on their place in the overtime roster—and on a larger pool of volunteers for shift trades—for standard overtime scheduling, while women, who are subject to the same standard overtime as men, are also subject to being ordered involuntarily to the BFOQ overtime, under less predictable circumstances as the males, and with a fraction of the pool of volunteers. The record further shows that this negatively effects morale among female deputies when they are strained to comply with overtime requirements. On this record, the Court determines that Defendant's motion for summary judgment on the issue whether Plaintiff has shown injury under Title VII must be denied, as Plaintiff has demonstrated a material issue of fact remains concerning injury under Title VII.

## III.   Retaliation Under Title VII

Defendant moves for summary judgment on Plaintiff's retaliation claim, asserting that Plaintiff caused her own termination when she disobeyed a lawful order and abandoned her shift. Def.'s MSJ at 28-40. Plaintiff responds that her refusal to comply should be "viewed against the backdrop of her years-long effort to correct [Defendant's] policy." Plf.'s Resp. at 17.

Unlawful retaliation is established when a causal connection is established between a materially adverse action and the individual's protected activity. The causation standard requires the evidence to show that "but for" a retaliatory motive, the employer would not have taken the adverse action. *Univ. of Tex. Sw. Med. Ctr. V. Nassar*, 133 S. Ct. 2517, 2534 (2013) (holding that "but-for" causation is required to prove Title VII retaliation claims raised under 42 U.S.C. § 2000e-3(a), even though claims raised under other provisions of Title VII only require "motivating factor" causation). To establish a prima facie case of retaliation under Title VII, a plaintiff must put forth evidence sufficient to show that: (1) she engaged in a protected activity, (2) she suffered an adverse employment action, and (3) there was a causal link between her activity and the employment decision. *Hashimoto v. Dalton*, 118 F.3d 671, 679 (9th Cir. 1997). Protected activity includes activity that was intended to "oppose[ ]" an employer's discriminatory practices. 42 U.S.C. § 2000e–3(a). Refusal to obey a discriminatory order can constitute an act of opposition under Title VII. *Moyo v. Gomez*, 40 F.3d 982, 984 (9th Cir. 1994), *cert. den.*, 513 U.S. 1081 (1995) (holding that "opposition can, of course, consist of refusal to carry out an order or policy.").

The parties both present compelling factual evidence for their claims. The record shows that Plaintiff had engaged in a long-term effort to voice concerns about the unlawfulness of the BFOQ overtime policy. *See* Ex. K, ECF No. 28-11 (email from Plaintiff outlining questions and observations about the BFOQ overtime procedure); *See also* Wells Decl., Ex. L at 2, ECF No. 12 (Plaintiff's supervisor stating that Plaintiff "made several negative comments during the course of the meeting about BFOQ policy[,] questioning whether it was necessary or lawful."). Further, one of Plaintiff's supervisors stated that termination may not have been appropriate under the circumstances. Harrold Dep. at 22:15-23:6.

Defendant maintains that Plaintiff could not have had a reasonable belief that the BFOQ overtime policy was unlawful, because her union had represented that it was lawful. Ex. R, ECF No. 28-18. Defendant further asserts that the evidence is that it knew for years about Plaintiff's opposition to its BFOQ overtime policy and did not terminate her during all that time, and that it was Plaintiff's "egregious" misconduct that led to her termination. Def.'s MSJ at 42. Further, Defendant state's that Plaintiff showed no remorse for her actions and that her actions showed that she was not trustworthy or reliable to taking orders, which is a necessary employment requirement to maintaining safety and security in a jail. *See id.* (cataloguing deposition testimony, case law, and jail policies). On this record, the Court determines that there are disputes of fact material to the resolution of Plaintiff's claim for retaliation, thus Defendant's motion for summary judgment on this issue should be denied.

## CONCLUSION

For the reasons stated, Defendant's Motion for Summary Judgment, ECF No. 28, and Plaintiff's Motion for Partial Summary Judgment, ECF No. 31, are DENIED.

IT IS SO ORDERED.

Dated this <u>28th</u> day of June 2023.

<u>s/ Ann Aiken</u>

Ann Aiken
United States District Judge